May it please the Court, my name is Joe Lovett, I'm here on behalf of Appellants. The only issue in this appeal is whether the Corps rationally considered cumulative impacts from biological impairment associated with surface coal mining and conductivity. The Corps defined cumulative impact area as the Dingus Run Watershed, so think of the watershed as a tree. Dingus Run would be the trunk of the tree and all of the tributaries are the branches of the tree. Van Mill Hollow and Rayless Fork are the lowest branches of the tree coming in to the trunk that is Dingus Run. So, to perform an adequate cumulative impact assessment, the Corps had to know something about the water quality in the trunk, Dingus Run itself, and not just in the branches or the tributaries. Can I ask you just a basic question? Yes. When the prayer for relief in your brief you just said reverse and remand, what do you want done on remand? Do you want the Corps to prepare an environmental impact statement? I think that the Corps should be ordered to reconsider its environmental, its EA, and determine again whether or not to prepare an EIS, and it should give reasons. Do you want them to prepare an EIS? I would like them to prepare an EIS, but I'm not asking the Court to order them to prepare an EIS, only to reconsider its decision, its EA, its environmental assessment, to determine whether or not, based on an analysis of Dingus Run itself, there are cumulative impacts. Is that going to result in anything more than we already have because there's already been a 102-page report? Then if that's all we did, it would just be a reiteration of a 102-page report. I think it would be different, Your Honor, because the 102-page report has a lot of water quality data, but almost no data about the central issue in this case, which is the impact of conductivity on impairment or on aquatic life. All of the water quality data, with four exceptions, go to conventional water quality criteria, stream chemistry like iron, manganese, aluminum, those kinds of traditional environmental mining impacts. But there's very little analysis of the central issue of this appeal and of EPA and the scientists' concern, which is the effect of conductivity in the watershed on aquatic life. So that is really what the Corps failed to examine and what it had to examine to reach a rational conclusion here. It didn't really look at those issues. If you look at the record, in the environmental decision document, the Corps addressed conductivity and impairment on only four samples. The rest is really irrelevant to this appeal. Three of those samples were in Raylis Fork, where there's no valley fill. The other sample is the one in Dingus Run that the West Virginia Department of Environmental Protection took, which shows their impairment. So it shouldn't result. So you want, on remand, you want a greater number of samples taken throughout the entire watershed? Well, I think that's up to the Corps. I think really what the Corps has to do is assess the science of conductivity, as EPA has told it to do. It must assess that science and make a determination about whether it has enough information to make a determination that there will be no cumulative impacts resulting from this mine. So I think the Corps could gather the information from wherever it will, but it has to go back to the drawing board and assess the issues that it failed. No, I would love an environmental impact study, and I'd be pleased if the Corps had ordered that. I was just arguing that the Corps need not do that. I mean, maybe we do, maybe we don't. I don't know, but it seems like we can just sort of jump through hoops. Well, my personal view is that that is needed. It's needed for West Virginia, for Virginia, and Kentucky. I know Kentucky is not in the Fourth Circuit, but there's a lot of this mining occurring. Everything turns on this issue about conductivity. The Corps has refused to address it, and you can see that in any of its permit issuances, and it certainly refused to address it in this decision document. So I think personally that an EIS would be useful. Now, the Corps indicates that they consulted with both EPA and the West Virginia Department of Environmental Protection, and that a lot of changes were made after that consultation, and that there were conditions placed upon Highland before the 404 permit could issue. And after these conditions were placed upon Highland and the 404 permit issued, EPA at that point then dropped its objections. And so I think their point is, you know, whatever reservations there were at the beginning, changes were made, conditions were imposed. For all I know, Highland has complied with the conditions. What do you say about that? I think that the Corps did not comply with EPA's conditions, all of them, particularly in the September 20, 2009 letter. Is the duty of compliance on the Corps, or is it on Highland? Well, the Corps didn't require Highland to meet the conditions that EPA specified. Specifically, it didn't meet the most important condition in the alternatives analysis, which is on page 143 of the appendix, that says the adaptive management plan should contain a sequence of specified actions to be taken in response to specified levels identified by sampling results, including levels of conductivity, total dissolved solids, selenium, and West Virginia stream condition index scoring. So that point is the heart of this case because it is the place in this letter that ties together aquatic life, that's the West Virginia stream condition index scoring, and conductivity. It did not do that. EPA said it may have been comfortable with the permit if the Corps required the applicant to do that, but the Corps did not. So did EPA explicitly drop its objections in September? It did not. EPA never specifically. Well, EPA doesn't make specific objections to a Corps permit. I mean, it could veto the permit. Well, I know that, but informally and by letters. Well, that letter, what I'm reading from is a September letter. That's the last document we have from EPA. And what it said was in that letter, if the Corps requires Highland to do these things, then we think the permit may be issued. It also says, though, that we believe, this is in the same letter, the September letter, we believe that with appropriate permit conditions, the applicant could move forward. That meeting, as far as I know, never took place. There were no appropriate permit conditions. And, of course, this adaptive management plan was never adopted. So I think that this letter, if the Corps had followed it, we may be in a different place, but the Corps did not take EPA's recommendation here. Are you putting us in the position of second-guessing scientific experts? Why or why not? Not at all, Your Honor. I think that all of the science points in the same direction. The Corps admitted that it had no scientific expert review its decision. It didn't call anybody else. It didn't hire a consultant. It didn't even pick up the phone to talk to a scientist that was capable of understanding the issue. What about Kimberly Brown? Kimberly Court Brown is not a she admitted in her, during the trial, that she was not an expert in this. She has a B.A. in chemistry. It's not no biology, and this is a biological issue. I think she admitted she wasn't an expert, and we cited that in our brief. So Kimberly Court Brown is the only person at the Corps that reviewed this as a regulator, and she did not have the expertise to understand the issues. Therefore, I'm not asking you to second-guess the scientists, but because she didn't have that expertise, she couldn't rationally apply the facts. She couldn't reach a conclusion based on the evidence before her because she wasn't qualified. And we're not arguing, as the industry says that we are, that the Corps has to hire outside experts that have Ph.D.s and are renowned in their fields, just that it has to have somebody qualified to understand the scientific issues before it and to analyze them and explain the decision. Another missing thing from this document is there is no explanation anywhere in the decision document about why the PON study, Greg PON, the seminal study in the area, was wrong. So you're saying the only science on the matter was cut in your direction? I think that's right. I think the judge below said the same thing, but I think it's clear that's the case. But I'm not even talking about the hearing itself or the expert testimony. The Corps decision document is missing any scientific analysis, any understanding or explanation of how it reached its conclusion and why Greg PON from EPA and all of the studies that say that conductivity is a problem, why those aren't valid. There's no assessment of that. It's the central issue in the appeal, and yet the Corps completely ignored it in its decision document. It talks a lot about other water quality issues, ones that aren't really relevant here. Highland also in its brief raises a lot of other water quality issues, but those are not relevant. The only relevant issue is the relationship among conductivity, stream impairment, and aquatic life. And that is a central issue in this mining. It has been for a long time. The Corps refuses to address it. So not a battle of the experts, Your Honor, and I don't think I'm asking, I'm not attempting to ask you to second-guess any scientist, just to hold the Corps to the standard of explaining itself and at least understanding the science and showing that it understands the science.  The first is that the West Virginia DEP sampled the aquatic life in the trunk in Dingus Run. This goes back to the baseline data. That's the only point, there's one point of analysis in this case in the trunk in Dingus Run where the cumulative assessment had to occur, and that shows that Dingus Run is impaired. That means that the aquatic life that should be there isn't there, and it's impaired. So DEP determined that. It's the only cumulative assessment here. So when the sample of the trunk showed it was impaired, nonetheless WVDEP didn't back off from its earlier water quality certification. I was surprised in view of that sample and what it indicated, what was the reason that the West Virginia Department still stuck by CWA certification? I can't speak for the DEP. It has never, as far as I know, withdrawn a water quality certification. I can say that the West Virginia Department of Environmental... Was the certification granted before the sample was even taken? The certification, the permit, the CHIA, the cumulative impact assessment that the WVDEP did, that was done before. The certification was granted in 2008. Yes, so the certification was before the permit was issued. The West Virginia certification was granted in 2008, and then the impairment listing was in 2010. That's right. Now was the sampling taken after the certification was granted? Yes, obviously it was. All right. Well, why, in light of the additional evidence, were not either, number one, further samples taken? Samples are taken. Or, number two, the certification withdrawn. Why would you have one sample and have it negative and have it showing a degree of impairment at the trunk, and then not take additional samples but also not withdraw the earlier certification? I mean, how does that add up? It's really inexplicable, Your Honor. I think that the reason... I can tell you, answer one of those questions, the reason that the sample was taken, because the State, every five years or three years, has to go and sample streams and turn in what's called a 303D list to EPA to determine which streams are impaired. So that sample was taken by DEP in its normal course of business to determine which streams are impaired. It wasn't related specifically to this project. It was just part of its normal sampling. What does impaired mean? It means that it's not supporting its aquatic life use. But I thought this report indicated that there was, that the stream was viable, that there was clear evidence that it was viable. No, quite the opposite, Your Honor. That report, the only report in Dingus Run, lists, finds a whiskey score of 33. Whiskey is the West Virginia Stream Condition Index. It's a very low score, showing it to be extremely impaired. So there's no question... I'm suggesting that there... I thought there was evidence suggesting that there was viability, evidence by insects and the presence of life in the stream itself. Well, there is life in the stream, but... Isn't that what viability is? But when the State or when, under the Clean Water Act, it's not just that a stream supports any life. It has to support the life that is supposed to be there. In other words, certain insects or fish are more sensitive to pollutants than others, and the stream has to support those organisms as well as those that are tolerant to the pollutants. Well, I was just responding to your answer on impaired, which you said it doesn't support life, and I thought the report indicated that it was. They used the word viable. What I intended to say was that it didn't support aquatic life uses, and that's, you know, just baloney language from the Clean Water Act, and aquatic life uses means that it supports all the aquatic life that it would support if it weren't for the pollutant in it. So a WSCCI score, a West Virginia Stream Condition Index score of 33 is a very low score. It shows that there are organisms missing from that stream that should be there, and that's a fundamental finding under the Clean Water Act of impairment, and that is the key here. It's the only measurement of impairment in dingus run in this case. Even if that score weren't there, even if there were no score, the Corps then would have no way of assessing the water quality of dingus run, and, of course, it says that it has good water quality. So the Corps is wrong. Its cumulative impact assessment is inadequate because it never looked at the trunk, the place that it's supposed to look, and the place that DEP looked and understood, that's where you look for a cumulative impact assessment. So the only point there shows extreme impairment. Okay. Thank you. Thank you. You've got some time remaining. Mr. Gray. Thank you. May it please the Court, my name is Michael Gray. I'm here on behalf of the Corps of Engineers. If I can, I'll start by addressing the order of the sampling that Mr. Lovett was just talking about and then back up and talk about what the Corps actually looked at to establish its baseline information and then the process and the best management practices that the Corps established. The sampling, if you look at page 375 of the Joint Appendix, the sampling that resulted in the 303D listing was taken on September 14, 2005. The 401 certification here was issued in 2008, and the actual 303D listing based on the sampling was in 2010. So in answer to your question, the sample itself was taken before the 401 certification, but the listing was after that. And as we've said, West Virginia did not revisit its 401 certification after putting Dingus Run on the 303D list. The sample was taken in 2005. The certification was in 2008. And the sample showed an impaired stream or a listing which was well below the numerical listing, which was well below the level of impairment. Why weren't additional samples taken? Or why was the certification issued in the face of a sample of the trunk, the receiving stream of all these tributaries, that showed it was well below what the department itself indicates is an acceptable level? Well, a couple of things. First, I think obviously the 401 certification is issued by the state. I'm not here to defend it, but I think I can explain where the state was coming from. I hope. One of the things that they said in their 303D listing was that the source and cause of the low score were unknown. So you have a low biological score, but even the state said we don't know why. We're going to develop that information as we develop the TMDLs, which are due in 2023. So without a cause, and then the second part of that is the state had other sampling that's in the cumulative hydrologic impact assessment. That's a document the state prepares when issuing this macro permit. And this goes back to the baseline because that's one of the documents that the Corps relies on here. And the plaintiff's argument is that the Corps didn't look at the trunk or any of the upper branches, but that's just not true. If you look at the cumulative hydrologic impact assessment, which is in the joint appendix at 399 to 401, the state had sampling data from a number of streams, including upper tributaries like Freeze Fork and George's Creek and Ethel Hollow, and a threshold monitoring site at the mouth of Dingus Front. The Corps took eight samples, I suppose, and the objection to that was that the analysis of the Corps was confined to a sub-watershed called Brand Mill Hollow. That's right. Brand Mill Hollow is a small sub-watershed, a small fraction of the overall Dingus Run. So they're saying that you looked at a very small area of tributaries, but you really didn't get into sampling the receiving stream. And what I'm saying is that is wrong. And it's wrong because we did have those sampling stations in the project area that the applicant set up, but we relied on the cumulative hydrologic impact assessment. And the discussion of that is at pages 247 and 248 of the joint appendix. Where did you sample water quality outside of the Brand Mill Hollow sub-watershed? If you look in the joint appendix at 399 to 401, they list the streams that the state had sampled water quality in over a number of years. They included, in addition to Brand Mill Hollow, Freeze Fork, which is a tributary equivalent to Brand Mill Hollow, but upstream in Dingus Run. Georges Creek, same thing. Rockhouse Branch, Camp Branch, Pine Fork, Ethel Hollow, Big Dark Hollow, Mash Branch, and Dingus Run. And it discusses there. Who sampled these? These are the state sampling that they issued in a cumulative hydrologic impact assessment. And in this court's Arachoma Coal decision, that's one of the documents in the similar cumulative impacts analysis there that the court said it deferred to the court looking at that document as part of the water quality discussion in that case. And so that's a legitimate document under this court's precedence for the court to be relying on. And it includes threshold monitoring at the mouth of Dingus Run. And it concludes, that document concludes, that this mine should not cause material damage to the hydrologic regime. You have that document in combination with the 401 certification, which the court looked at, and the 402 permit, which the state also didn't make any changes to. Let me ask you just a procedural question, and that is, what is the big objection to doing an environmental impact statement? This is obviously something Congress envisioned. And it doesn't affect the merits in any way. It doesn't say that Highland can't put the waste rock into the valley field. So all it says is that before you put 38 million cubic yards into the valley field, just have your eyes and ears open and understand a little bit more of what you're doing. And it's a process kind of thing. And yet there seems to be so much objection to doing this one document. And I don't know, is it too much time and trouble? Are you afraid of what you might find? But just intuitively, what I'm having a tough time with is 38 million cubic yards are being put in a valley field, and some of the state sampling indicates there may be a problem. And EPA's March 2009 objections are pretty seriously stated. And yet, notwithstanding the quantity of the discharge and the potential sensitivity, we're saying, oh, there's no significant environmental impact. And then we have a statute here that says we'll do this. So you're just digging in against any environmental impact statement. And I just wonder why, because this is not something that causes you to halt in your tracks. It's just a process value that says, you know, let's be aware of what we're doing before we do it. It is. And I don't think that there is any standing objection to doing an environmental impact statement if the Corps found that that was necessary. But it went through a process here. You mentioned EPA issued some objections, and the Corps had a number of discussions with EPA and adopted a number of the best management practices, including monitoring, a bimonthly monitoring by the state, just for the values, the conductivity that the plaintiffs were discussing, and said if those values are high, the company is going to have to engage in some further mitigation. But the EPA letter from March 2009, and your opposing counsel has said that the September letter is a little bit hedged. But the EPA letter here says the direct and cumulative impacts from this and future mines will be persistent and permanent and cannot be sufficiently or effectively compensated through the proposed mitigation. Then it asserts that the proposed project, quote, will result in significant impacts to the human environment. And I realize there were consultations after that, and there were mitigation measures proposed.  But it's also saying, you know, it's also a little bit contingent, and it's hedged. But... Well, let's be clear about one thing, which is that EPA's letter, the initial letter, the March letter, is not simply asking for an environmental impact statement. Its recommendation was denial of the permit because the standard of the Clean Water Act, significant degradation. And so the Corps then worked with the EPA to say, are there conditions we can impose on this and monitoring that will make this a non-significant degradation under the Clean Water Act, which the Corps then believes is also a non-significant impact under the National Environmental Policy Act, although there may be some room between those two concepts. I'm not sure significant means exactly the same thing in both statutes. But where EPA was then satisfied, if you impose these conditions and impose the monitoring, you're not going to have to deny the permit under the Clean Water Act. But you could have an EIS and then proceed to grant the permit. You could, although I'm sure we would face a challenge saying that if you have a significant impact underneath, but that's significant degradation under the Clean Water Act. And we'd have to sort out the difference between significant in those two statutes. But if you found that, maybe it shouldn't go forward. Maybe the permit shouldn't issue if this was going to be damaging to this whole watershed. And the point here is that the primary entity responsible for water quality in this watershed is the state. And the state has a 401 certification, a 402 permit, the Cumulative Hydrologic Impact Assessment, all of which this Court said is information the Corps can rely on in the Aracoma Coal case. And then you have EPA come in with some objections, and the Corps engaged in a process and said, how can we do this? And they came up with five best management practices that the Corps imposed, as well as the monitoring plan with bimonthly monitoring with further conditions should the impacts at the Plain of Sphere be found at that point. That is a sufficient hard look to satisfy NEPA and the conclusion that the Corps reached, that the impacts are not arbitrary, or that the impacts are not going to be significant, was not arbitrary and capricious, and we therefore ask that the Court affirm. Before you sit down, can I ask you a question? I maybe am missing something. I thought that the objections were complaints about the baseline evaluations of the water and that the data collected weren't adequate to accurately reflect what the condition of the water is now. And I understand from the report that the condition of the water now clearly reflects 100 years of mining or more, and there has always been some pollutants in that stream, some natural and some from previous mining. And so the first attempt is to find the baseline. The second step is to predict what the new mine will cause to that baseline. And I thought the objection was mostly with determining the baseline in this case, whether that was rational, because the predictive effect doesn't seem to be that challenged. I mean, they know exactly what's going to be done, and the question is whether it's a prediction. Am I right about that? I think that that's right. Their primary objection has been to the baseline. They've also raised the objection that the Court didn't reach on cumulative impacts, the correct decision on significance. But as you say, that's not based on the Court's failure to look at something. It's a disagreement with the Court's – It's how the mining is done and where the rocks are going to be put and what's in the veins. For instance, selenium is not even located in this area. So they can predict that when they mine, there's not going to be a selenium. That's right. Their objections are all based on information that is not specific to this area or this mine, but conductivity as it relates to mining generally, information the Court looked at. It looked at two other studies that reached different conclusions about the ultimate impacts of mining downstream and weighed that against the PON study and concluded that with the best management practices, this could go forward. They disagree. They think that there is a real strong correlation and we should have reached a different conclusion. Let me just continue with my line. If that's correct then, it seems to me that the EA would be evaluating the particular mining project at issue in this case, the particular mine, and conclude that that particular mining is not going to have a significant impact. That's right, and there are statements throughout the document in response to the comments saying that no compelling evidence that is specific to this mine has been brought forward by anyone, EPA or the plaintiffs. It's a general scientific opinion. Thank you. Mr. McCluskey. Please, the Court. I'm Bob McCluskey here for Highland Mining. I'll just follow up on some of the answers Mr. Gray gave, if I might. I'll start first with the fact of the 303D listing of Dingus Rot. That's a listing based on this West Virginia Stream Condition Index that Mr. Lovett mentioned. This case, as Judge Chambers found, is about water quality. The claims of the appellants were exclusively about water quality. The measurement used, the 2005 measurement, is not a water quality measurement. It's a measurement that looks simply at the assemblage of bugs that are in the stream. Many other things, and it's undisputed in the record, can cause changes to the sensitive bugs in the stream. It doesn't have to be a pollutant or even a discharge to the stream. Cutting the trees down, impervious material. So are you saying that the West Virginia sampling was meaningless or what? It's not meaningless. It's relevant, but I think what the Court found was that it was not material here. And what I was going to get to was, and that explains a little bit the difference between the 303D listing and the 401 certification. The 401 certification is looking at whether discharges of fill material, not mining. That was resolved in the Aracoma case. The scope of review here is limited to whether the discharges of fill material under the 404 permit will contribute to a violation of water quality standards downstream. And the West Virginia DEP says in its certification it will not. That's a different question than whether the stream should be on some list because of the bug assemblage. What DEP essentially has found is the discharges from this mine will not substantially So my questioning here right at the end, which was when we do an EA in a case like this, it's a predictive document looking at the mining effort. And in this case, it's really the portion of the mining which takes the surplusage and puts it in the valley there. And the assessment is whether that will create a substantial degradation. That's correct. And to have this fight about the baseline doesn't seem to contribute to a lot until, I mean, obviously, if you create a baseline that's false or phony, but that's where the challenge is. The challenge isn't to the future prediction about what this mining practice is going to cause. And it seems to me to do an EIS with respect to that doesn't contribute anything. Well, the EA itself took three and a half years here. I mean, this has been in progress for three and a half years. An EIS would contribute more time, but no new analysis as far as we know. All of the data that Has there been any challenge to the predictions about what the rock will cause? I believe there's disagreement between the experts, and that's what Judge Chambers talks about, that there's a fair question in the science here as to the role of conductivity in its correlation or causal relationship to these bug scores. That is a hotly debated topic. And the PON study that OVEC relies on does not answer that question. PON, they claim, is the big game changer between this and the Aricoma case, but PON does not. at whether mining is correlated to change in these bug scores. And he states, and I quote, The premise that mountaintop mining, not conductivity, but mountaintop mining as a whole, causes downstream biological degradation is plausible, given wholesale landscape changes, hydrologic alterations, and potential toxicants that are discharged. And he goes on to say that toxicity tests on conductivity have yielded mixed results. The core in this case then looked at information unique to this watershed and other mines and determined that in those cases, and I think it's on page 254 of the joint appendix, that high conductivity levels have not adversely affected the benthic macroinvertebrate community. Some of those samples were taken in the Rayliss watershed. I'm sorry, you said high conductivity levels does not affect aquatic life? That's the core concluded that based on the data that was submitted here. And if you look at, I think, I don't understand, I just don't understand how that could be. Because if you have a high conductivity level, then that high conductivity is only made possible by the presence of all kinds of minerals and pollutants other than pure water. Conductivity, there's no question that conductivity is a product of water dissolving salts out of rock, whether it be part of the discharge that's regulated in this case or not. There's no conductivity. There's no question about the fact that conductivity is caused by water flowing over broken rock. But if you look at page, I think, 416 of the joint appendix here, you'll see DEP has plotted the aquatic index scores, these West Virginia Stream Condition Index scores against conductivity. Is mineral water, when we buy it in a grocery store, more conductive water? Yes, it has total dissolved solids in it. That's what mineral water typically is. So we drink that without. You do, you do. And my opponents would say that doesn't answer the question about main lines, obviously. I'm trying to figure out, in response to Judge Wilkinson's question, if conductivity is necessarily hostile to viability. No, it's not. And that's my point. If you look at page 416 in DEP's explanation of this. It's relevant, is it not? It can be relevant, but it is not definitive here. It may not be definitive, but why isn't it relevant? If you have an unpolluted stream, there's going to be no conductivity there. Electricity can't move through that. Well, no conductivity will kill these bugs as quickly as conductivity will. It'll suck the salts right out of them. All right. But what DEP has found is that you – May I ask you just a practical question? Why do you – just talking specifically about this particular mining and this particular mining waste disposal. Why do you say specifically, apart from the general quality of the stream and the rest, why do you say specifically this is not going to impact water quality? Is it the fact that the waste rock is going to be placed way away from any tributaries, so far away that it's really not going to get into the stream flow? Or is it the fact that it's not going to seep into groundwater? Or is it the fact that it's not a significant enough quantity? But why is it that you're saying that a deposit of this magnitude is not going to have a significant impact on the watershed? I still don't know that. How far from these streams are you going to be placing all this stuff? The rock that is regulated by the Clean Water Act is placed in the stream. Right. And that's why we're here. We wouldn't need a permit from the Corps of Engineers unless that rock is being placed in – So it's placed in the waterway? Exactly right. And that's not going to affect the waterway? It's going to affect it, but the Corps found not in a material way. We'll know that until we take a harder look. The Corps has done that. It looked at high conductivities in this watershed, 862, which is higher than the water in Dingus Run now, and found compliant and high bugsports. Hold on a minute. I'm saying you're telling me that you place 38 million cubic yards of waste rock in a waterway about which there are already questions, and it's not going to have a significant environmental impact? Absolutely. That's exactly what I'm telling you. Okay. What does that do to the statute, and why shouldn't we have an environmental impact statement to find out? Because there will not be a significant impact. There's no need to do an EIS unless that threshold is passed, and it wasn't passed here. And what more is an EIS going to do here three and a half years after review? Nothing. There's nothing left to be done. There's nothing left to be looked at here. So you're saying there's really no difference between a FONSI and an EIS? That's a, in large part, yes. Over time, the NEPA statute has morphed to the point where many of the environmental assessments look a whole lot like EISs, but then that's for another day, I think. But there was adequate review here with site-specific data to show that there won't be significant impacts. There was water chemistry looked at in Dingis Run. There was also benthic data from Dingis Run that no one has mentioned. Page 253 of the Joint Appendix, there were six sample sites in Dingis Run itself that were sampled, and the Corps found that those benthic communities looked fairly healthy, notwithstanding 100 years of disturbance in the watershed. I see my time is up. I'd be happy to answer any questions. Thank you. Mr. McCloskey, let's hear from Mr. Lovett. Thank you. The reason that the Corps doesn't want to do an EIS is because it doesn't want to look at this cumulatively. It piecemeals things. It's been piecemealing these with permits for years. We all know all of the evidence in the record shows that conductivity is extremely high in these streams and that aquatic life is impaired. But the Corps, despite issuing permit after permit that bury more streams than this in these three states, will not prepare an environmental impact study just to look and see. It doesn't want to confront the science. And it very carefully avoids confronting the science and the issue altogether in this decision document. Turn the Court's attention to page 401, which Mr. Gray raised. Page 401 of the joint appendix lists all of the streams that West Virginia DEP looked at in the CHIA, the cumulative impact assessment that DEP does that the Corps says it relies on. And let's just focus on paragraph 11, which is Dingis Run. And what the DEP said in the CHIA is that all of the above described streams are tributaries of Dingis Run, and Dingis Run reflects the overall quality of its tributaries. TDS and sulfate concentrations increase downstream. Now, TDS and sulfate concentrations are the same as conductivity. So they're saying as you go downstream, TDS and sulfates increase. The pH, iron, manganese, aluminum are compliant with slight increases downstream. So what the DEP says on all of these streams is that those pollutants, pH, iron, manganese, and aluminum, are compliant. The water quality is fine for those pollutants. We don't argue with that. The DEP did a fine job in its CHIA of looking at those conventional pollutants. What the DEP failed completely to do, and what the Corps failed completely to do, is look at the pollutant we're talking about, conductivity. It's substituted. I thought that's one and the same. In other words, all of those dissolved salts create conductivity. And I thought the issue is when you get to a toxic, something like selenium. No. And they concluded selenium wasn't implicated here. No, selenium is a completely different pollutant. Well, I understand it is. It's not part of conductivity. You're suggesting conductivity does not include these metals? It does not include. The metal, what it includes here are the TDS and sulfates in the statement. A sulfate is, I'm not a chemist, but I know that sulfates are one of the salts that lead to high conductivity. That is not true of pH, iron, manganese, aluminum, or selenium. They are not the salts. They are not the salts that you talk about. So, again, I'm not a chemist. But the main thing here is that the Corps and the DEP have evaded for years now any analysis, any scientific analysis of the impacts of conductivity. And they did it in this permit. And the way they did it is there are four data points here relating to stream impairment. Three of them, one of which Mr. McCluskey just mentioned, are on Rayless Fork. There is no valley fill on Rayless Fork. So that conductivity number is not relevant to what we're talking about. The only other conductivity number associated with an impairment number in the decision document and in this joint appendix is the conductivity number in Dingus Run that the West Virginia DEP took, yielding a whiskey score or West Virginia Stream Condition Index score of 33, showing severe impairment. That's the only relevant point. Just in simple terms, what do you think you would get from an environmental impact statement that you don't already have as a result of a FONSI, which requires a hard look? The FONSI isn't a statutory creation, as I understand it. It's a regulatory creation and everything, but it does require a hard look. So what more are you going to get from the environmental impact statement that you do not already have? Well, we get two things at least. One is the court mentioned earlier, and Judge Wilkinson, you mentioned earlier, that maybe if there's significant degradation, the project shouldn't go forward at all. That is the requirement of the Clean Water Act. Under Section 404 and the 404B1 guidelines require that there be no significant degradation. So if an EIS found that there were going to be significant degradation, the project could not go forward as proposed. It would have to be reconfigured. Different treatment methodologies would have to be imposed. We would understand for the first time what kinds of controls can be placed on these mines to protect the aquatic life and comply with the Clean Water Act. Right now we have nothing. Don't forget, all this monitoring is after the fact, and this bell cannot be unrung. Once that valley fill is placed, once all those millions of cubic yards are placed in the stream, they can't be taken out. An EIS would force the court to grapple for the first time with the science. It has avoided that analysis for years, and it's avoided it in this document. You say it would in a comprehensive way. What do you mean by that? There have been since the PON study, the PON study is the seminal study, but since the PON study there have been more than 20 papers published on this issue in peer-reviewed journals. The court has refused to look at them. Somebody needs to sit down, gather all these data together, write a report about what they mean for West Virginia, Virginia, and Kentucky streams before the permits go forward so that the people will, as Congress intended, will at least be informed about what the project is doing. With that study, for instance, rock is not all rock. I mean, rock changes from location to location. And if you have a big collapse of a wall, of a stream, just a natural collapse of rock into the stream, you're going to have increased conductivity, right? Probably. Because something from the rock is going to dissolve into the... That makes sense. Yeah. So the question would be, I suspect, is that such a study could not be as universal as you're talking about. It would require a look at the particular location, the particular mountain on which you're throwing the rock in. I mean, if it's all solid granite, there's not going to be as much dissolution as there is sandstone. This is way beyond the record of the case, but we know, we know very well, and there are numerous studies published showing all of these, all of the mining in these regions have what they call a sulfate signature. When there's mining, when there's areas that are blown up for mines, there's sulfate in the water, and that is the signature of the high conductivity associated with surface mining. Look, we know a lot about conductivity and its impacts on aquatic life, and we know a lot about what mines do to it. It's the core that's burying its head in the sand and doesn't want to know and doesn't want to prepare a report that will allow people in the states to understand what's happening, and that's why NEPA is there. NEPA is there so that we don't make uninformed decisions like the one made here. Thank you, Mr. Love. Thank you. I will come down and greet counsel and then go into our next case.
judges: William B. Traxler Jr., J. Harvie Wilkinson III, Paul V. Niemeyer